UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| CRAIG KENDALL, | ) | CIV. 05-5066-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| BAUSCH & LOMB, INCORPORATED | ) | |
| and LASER VISION CENTERS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

Defendant Laser Vision Centers, Inc. (LVCI) moves for summary

judgment. Docket 203. Plaintiff, Craig Kendall, opposes the motion. For the

reasons stated below, the motion for summary judgment is denied in part and

granted in part.

**FACTUAL BACKGROUND**

Following are the relevant facts construed in the light most favorable to

Kendall, the non-moving party:

On December 1, 1998, LVCI entered into a Refractive Laser Access

Agreement with Ophthalmology Associates (OA) in Aberdeen, South Dakota.

See Docket 226-2. The contract provides that "LVCI will agree to provide

refractive laser access and other related services to OA." Id. at 5. Among

LVCI's duties are providing OA with "refractive laser services," including access

to a refractive laser and other refractive equipment and maintenance and

repair of all refractive equipment. Id. at 6. The "other refractive equipment"

specified in the agreement is limited to a VISX Star laser and the related

supplies of "[o]ne PRK or one PTK Card per procedure/eye," calibration cards, and gasses. Docket 226-2, page 12 (Exhibit A to the contract). The agreement also states that LVCI will "employ and provide fully trained and appropriately certified personnel necessary to assist OA in the operation of the laser and other refractive equipment provided by LVCI." Id. "In short, LVCI provided certain portable LASIK surgical services and incidental items or access," including "the laser, the laser technician/operator, microkeratome and microkeratome technician, and certain disposable supplies including the surgical blades." Docket 205, Defendant's Statement of Undisputed Material Facts (DSUMF) ¶ 7.

The Refractive Laser Access Agreement requires OA to use only certified ophthalmologists while performing all patient care and treatment with the laser. Docket 226-2 at 6-7. It also states that "OA shall provide all pre, intra and post-operative supplies, all refractive surgical instrumentation, and sterilization capability necessary for the care of patients receiving refractive laser procedures." Id. at 7. Further, "OA agrees not to perform laser refractive surgery utilizing equipment provided by any vendor of refractive laser services . . . other than LVCI." Id. Finally, fees are paid from OA to LVCI on a per procedure basis, and it appears that the procedure fee includes the cost of any supplies provided to operate the refractive laser equipment. Id. at 13.

During LASIK surgery, a device called a microkeratome applies suction to the patient's cornea while a motorized blade cuts a flap of the corneal tissue.

DSUMF ¶¶ 18, 21.  The surgeon then uses a laser to remove corneal tissue, after which the flap is replaced.   On December 10, 2002, Kendall underwent LASIK surgery to correct his vision at OA's clinic in Aberdeen, and Dr. John Bormes performed Kendall's surgery.  LVCI microkeratome technician Elaine Shotwell assisted Dr. Bormes during Kendall's surgery.  For the surgery, Dr. Bormes used a microkeratome with an AccuGlide blade from manufacturing lot #517984.  Id. ¶ 19.  The microkeratome blade was provided to OA by LVCI, who had purchased it from Bausch & Lomb (B&L).  B&L designed, manufactured, and packaged the blade and sold it to LVCI.  Id. ¶ 2.  At the time, LVCI was one of B&L's largest customers of blades, and it was contractually obligated to purchase at least 90 percent of its microkeratome and keratome blades from B&L.  Id.

No complications arose during the surgery.  Docket 228, Plaintiff's Statement of Material Facts (PSMF) ¶ 3.  It is Shotwell's normal practice to inspect the AccuGlide blade under a microscope to ensure that there are no visible defects and to reject the blade if it appears abnormal or defective. DSUMF ¶ 24.

After the surgery, Kendall developed diffuse lamellar keratitis (DLK) in both eyes.  Id. ¶ 27.  DLK is an inflammatory condition of the interface of the corneal flap that may be a complication of LASIK surgery.  Id. ¶ 28.  While the causes of DLK are not completely understood in the medical community, it is generally understood to be multifactorial in origin.  Id. ¶ 15.  One LVCI

employee estimated that she can identify the cause of a DLK outbreak in 60 percent of cases. Docket 227, Plaintiff's Response to DSUMF ¶ 61.

OA performed eleven LASIK surgeries on December 10, 2002, and all surgeries utilized equipment and staff provided by LVCI. All of Dr. Bormes' patients from that day whose surgery involved a blade from lot #517984 developed DLK. PSMF ¶ 20. Prior to this date, none of Dr. Bormes' LASIK patients had contracted DLK. Id. ¶ 5. As a result of his DLK, Kendall required a further procedure called a flap lift, after which he developed further complications, including striae, epithelial ingrowth, and irregular astigmatism. PSMF ¶ 23. Kendall has undergone additional surgeries to address these complications, and he has sustained permanent injury that he claims stems from the DLK. Id. at ¶ 24.

Prior to November 2002, LVCI was aware of a DLK incidence rate of less than one percent. Id. ¶ 25. During this time, Denice Gerstenberger worked at LVCI as an assistant to Stacy Lerum, the Director of Clinical Services and Quality Assurance. On November 18, 2002, Gerstenberger received a phone call notifying her of several occurrences of DLK at one of LVCI's facilities. Id. ¶ 34. Thereafter, LVCI continued to receive reports of DLK occurrences, and it attempted to determine the cause of the DLK. DSUMF ¶ 32. On November 28, 2002, Lerum received a call from a Michigan surgeon that his facility had several DLK cases, and she reviewed the cleaning protocol, tested the autoclave for bacteria, and talked with the technician. PSMF ¶¶ 37, 38. On December 3,

2002, Lerum received another report of DLK occurrences at another facility. Id. ¶ 45. Prior to this time, LVCI had not experienced concentrated outbreaks of DLK at multiple sites that were ultimately associated with a certain blade lot. DSUMF ¶ 45. On December 4, Lerum told Gerstenberger to examine the lot numbers of all disposable supplies used in the surgeries which resulted in DLK. PSMF ¶¶ 45, 47. It does not appear that Gerstenberger investigated the lot numbers of the disposable supplies, as Lerum had directed. Gerstenberger attempted to contact B&L staff on December 6 and December 9 regarding the DLK incidences, to no avail. DSUMF ¶ 33.

On December 9, 2002, LVCI received another report of a DLK outbreak at a fourth facility. PSMF ¶ 48. The next day, Gerstenberger contacted Julie Moore, Products Surveillance Officer at the St. Louis B&L facility, to ask about testing a keratome for potential contaminants which could cause DLK. DSUMF ¶ 34. Moore asked Gerstenberger which blade lot numbers were associated with the DLK occurrences, suggesting that it could be lot #517984. Id. ¶¶ 34, 35. Gerstenberger checked and confirmed that this blade lot was a common element in the surgeries that resulted in DLK. Id. ¶ 37. Upon learning about the DLK incidences in surgeries using blades from lot #517984, LVCI ordered an immediate recall of the blades from lot #517984. Id. ¶ 38. That same day, Lerum and Gerstenberger made phone calls to all facilities which possessed blades from that lot. Lerum called OA at the end of the day, after Dr. Bormes had performed Kendall's surgery, to notify them of the blade recall. Id. ¶ 39.

Lerum spoke with Dr. Bormes and other OA staff about DLK identification and treatment protocols and sent the office information about the diagnosis and treatment of DLK.  Id. ¶¶ 39, 40.

On December 13, 2002, B&L voluntarily recalled blades from lot #517984.  Prior to this date, B&L had received many complaints of DLK occurrences in surgeries involving this blade lot and other closely-affiliated lots.  Id. ¶ 46.  Until it issued the recall, however, B&L did not contact LVCI or any other customer regarding the DLK complaints affiliated with blade lot #517984.  Id. ¶ 50.  LVCI's first contact with B&L regarding these complaints was on December 10, 2002, at the initiation of LVCI staff person Gerstenberger.  If he had known about the increased DLK occurrences with blades from lot #517984, Dr. Bormes would have refused to use a blade from that lot number in any surgery, including Kendall's.  PSMF ¶ 27.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as

a matter of law.  Id.; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Once the moving

party has met this burden, the nonmoving party may not rest on the

allegations in the pleadings, but by affidavit or other evidence must set forth

specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ.

P. 56(e)(2).  In determining whether a genuine issue of material fact exists, the

court views the evidence presented based upon which party has the burden of

proof under the applicable substantive law.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## DISCUSSION

I.    **Products Liability**

A.    **Strict Liability**

LVCI contends that Kendall's strict liability claim must be dismissed

because, under the law in South Dakota, only sellers are strictly liable for

physical harm caused by a defective product.  Docket 204, pages 10-13.  In the

alternative, LVCI argues that it is immune from products liability claims under

SDCL 20-9-9.[1]  Id. at 13.

1.    **LVCI's Liability as a Seller or Distributor**

_____

[1] LVCI also joins B&L's argument in its motion for summary judgment
that Kendall is unable to establish that the blade was defective or that the
blade caused his damages.  Id. at 13-14; see also Docket 182, pages 5-18
(B&L's motion for summary judgment).  This court has denied B&L's motion for
summary judgment on these grounds and, for the reasons set forth in that
opinion, refuses to grant summary judgment to LVCI on these grounds.

LVCI first argues that the relevant law is Restatement (Second) Torts § 402A, as adopted by South Dakota courts. Docket 204, page 10. That provision imposes liability on "sellers," and LVCI argues that it is not engaged in the business of selling AccuGlide surgical blades. Id. at 10-12. Instead, contends LVCI, it is a "provider of professional services," and it therefore cannot be strictly liable under § 402A. Id. at 12-13.

In response, Kendall states that his strict liability claim is based on LVCI's failure to warn of a dangerous product. Docket 225, page 9. Kendall argues that the applicable law is found in Restatement (Third) Torts, Products Liability § 10 which discusses the liability of a "distributor for harm caused by a post-sale failure to warn." Id. Kendall contends that LVCI is a distributor under this provision, and that the true nature of LVCI's contract with OA is not one for services, but instead was a lease that provided access to equipment. Id. at 12; see Restatement (Third) Torts, Products Liability § 20 (defining "one who sells or otherwise distributes"). Thus, under the Restatement (Third) Torts, Products Liability, argues Kendall, LVCI may be strictly liable to Kendall for providing defective blades to OA.

Section 402A of the Restatement (Second) Torts provides:

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer.

South Dakota courts have adopted this section of the Restatement as the law in relation to strict liability. Peterson v. Safway Steel Scaffolds Co., 400 N.W.2d 909, 912 (S.D. 1987) (citing Engberg v. Ford Motor Co., 205 N.W.2d 104 (S.D. 1973)). Comment *f* to § 402A provides that the rule "applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, [and] to any wholesale or retail dealer or distributor." In addition to sellers, South Dakota courts have applied § 402A to lessors of commercial equipment, because they "regularly introduce potentially dangerous products into the stream of commerce for profit and similarly are in a better position than lessees to insure against the risk of injuries from products in which they deal regularly." Peterson, 400 N.W.2d at 914 (citing comment *f* to § 402A). Additionally, in a failure to warn claim such as this one, if a plaintiff can prove that the product was rendered unreasonably dangerous by the absence of adequate warnings, he need not prove the existence of a specific defect. Id. at 912. In other words, "an otherwise properly manufactured and well-designed product may be found to be defective without an adequate warning." Id.

Viewing the evidence in the light most favorable to Kendall, there is sufficient evidence to show that LVCI is a "seller" under Section 402A of the Restatement (Second) Torts. See comment *f* to Restatement (Second) Torts § 402A (stating that this rule applies "to any person engaged in the business of selling products for use or consumption . . . [including] any wholesale or retail

dealer or distributor"). Despite its attempts to characterize the contract as one of "access," LVCI admits that it also provides OA with disposable supplies such as the AccuGlide blades. Docket 205 ¶¶ 4, 7. In return, OA pays LVCI a per-procedure fee, which certainly includes a cost for such disposable supplies. LVCI makes no claim that it provided the AccuGlide blades gratuitously, and because this was a business agreement, the court concludes that the fee OA paid to LVCI includes a fee which covers the cost of the microkeratome blades. Finally, LVCI does not dispute that it provides AccuGlide blades to OA and to other similar parties as part of the Refractive Laser Access Agreements. Cf. Mini Mart Inc. v. Direct Sales Tire Co., 876 F.2d 63, 65 (8th Cir. 1989) (affirming dismissal of strict liability claim because "there is no substantial evidence that Direct Sales was in the business of selling gasoline storage tanks"). The court agrees with Kendall that the arrangement between LVCI and OA is a "combination of a lease, sale, and some incidental services." Docket 225, page 3. For these reasons, the court concludes that LVCI is, among other things, a seller of the AccuGlide blades to OA.

In the alternative, LVCI is a commercial lessor, similar to the defendant in Peterson, because it "introduce[s] potentially dangerous products into the stream of commerce for profit" and is better able than a lessee like OA to "insure against the risk of injuries from products in which they deal regularly." Peterson, 400 N.W.2d at 914. This case differs somewhat from Peterson, however, because the leased equipment that is the primary focus of the

10

contract–the refractive laser–is not the allegedly defective product in this case, as the scaffolding equipment was in Peterson. See id. at 911. Nevertheless, in this case LVCI agreed to provide access to "a refractive laser and other refractive equipment," and LVCI agreed to be OA's exclusive supplier of all "equipment" related to refractive laser services, including the microkeratome that utilized the AccuGlide blade. Docket 226-2, page 6; id. at 8 (providing that OA will "not perform laser refractive surgery utilizing equipment provided by any vendor of refractive laser services . . . other than LVCI"). LVCI does not dispute that OA received its AccuGlide blades from LVCI as part of the access agreement regarding the microkeratome and refractive laser. DSUMF ¶¶ 3, 6, 7. As in Peterson, LVCI is better able to insure against the risk of injuries from AccuGlide blades, a product in which LVCI deals regularly. See DSUMF ¶ 2 (stating that LVCI "was probably B&L's largest customer of blades"). Further, LVCI, like Peterson, is "regularly introduc[ing] potentially dangerous products into the stream of commerce for profit." Id. at 914; see also Miles v. General Tire & Rubber Co., 60 N.E.2d 1377, 1381 (10th Cir. 1983) (cited in Peterson) (stating that commercial lessor of motor home could be held strictly liable when tires supplied with motor home were found to be inadequate).

 LVCI cites a number of cases in support of its contention that it is not a seller or commercial lessor within the scope of § 402A. Docket 204, pages 12-13. But these cases are not persuasive to the facts here. First, several of the cases cited by LVCI are decisions absolving a hospital or surgeon of liability for

defective medical devices, concluding that the hospital or doctor was providing medical services and was not in the business of selling the medical devices. McKenna v. Harrison Mem'l Hosp., 960 P.2d 486, 487 (Wash. Ct. App. 1998) (based on state law); Cafazzo v. Centr. Med. Health Servs., 668 A.2d 521, 524-25 (Pa. Super. Ct. 1995). These cases are distinguishable because the defendants were hospitals and physicians who utilized the defective medical devices during a surgery, and LVCI is not similarly situated.[2] In the case at hand, it is undisputed that LVCI contracted with OA to provide LASIK equipment as well as disposable supplies. The remainder of the cases cited by LVCI involve strictly service contracts where defendants were only "occasional" sellers, see Bailey v. ITT Grinnell Corp., 536 F. Supp. 84, 89 (N.D. Ohio 1982), or situations where "no goods or other property" were supplied by defendants, see Raritan Trucking Corp. v. Aero Commander, Inc., 458 F.2d 1106, 1113 (3d Cir. 1972); Ames. v. Ford Motor Co., 299 F. Supp. 2d 678 (S.D. Texas 2003) (finding that customs broker was not seller when he never exercised control over the product and only provided services to facilitate transfer of vehicle), or are cases that were decided entirely on state law regarding negligence and warranties, see Anderson Hay & Grain Co., Inc. v. United Dominion Indus., Inc., 76 P.3d 1205 (Ct. App. Wash. 2003) (in express warranty and negligence

---

[2] Instead, these cases would appear to be applicable to a claim against OA or against Dr. Bormes. But such claims were not brought in this case.

claims based on the Washington Product Liability Act, finding that defendant was not a seller but was a service provider).

For the reasons stated above, the court finds that LVCI falls within the scope of § 402A, either as a seller or as a commercial lessor, and thus may be held strictly liable under South Dakota law for a product rendered defective by the absence of a warning.

As for Kendall's claim that the Restatement (Third) Torts, Products Liability, § 10, is the applicable law, the South Dakota Supreme Court has not applied Restatement (Third) Torts, Products Liability. Even though it was promulgated in 1998, the South Dakota Supreme Court has never applied it, nor does the South Dakota Pattern Jury Instructions refer to it. In <u>Robinson v. Brandtjen & Kluge, Inc.</u>, 2006 WL 2796252, *6 (D.S.D. Sept. 27, 2006), however, the district court found that the Eighth Circuit decision in <u>Novak v. Navistar Int'l Transp. Corp.</u>, 46 F.3d 844, 850 (8th Cir. 1995) was "persuasive authority predicting that the South Dakota Supreme Court would adopt the third Restatement regarding a post-sale duty to warn." The court need not decide today whether Restatement (Second) Torts or (Third) Torts applies because even if the court did apply Restatement (Third) Torts § 10, genuine issues of material fact exist which would preclude an award of summary judgment for LVCI.

Restatement (Third) Torts, Products Liability § 10 provides:

(a)     One engaged in the business of selling or otherwise
        distributing products is subject to liability for harm to

persons or property caused by the seller's failure to provide a warning after the time of sale or distribution of a product if a reasonable person in the seller's position would provide such a warning.

(b)    A reasonable person in the seller's position would provide a warning after the time of sale if:

    (1)    the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

    (2)    those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

    (3)    a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

    (4)    the risk of harm is sufficiently great to justify the burden of providing a warning.

This provision "specifically injects negligence principles into strict products liability" actions. <u>DeSantis v. Frick Co.</u>, 745 A.2d 624, 631 (Pa. Super. 1999) (declining to adopt § 10); <u>see also</u> <u>Robinson v. Brandtjen & Kluge, Inc.</u>, 500 F.3d 691, 697 (8th Cir. 2007) (viewing § 10 as a provision concerning *negligent* post-sale failure to warn). "In deciding whether a claim based on breach of a post-sale duty to warn should reach the trier of fact, the court must determine whether the requirements in Subsection (b)(1) through (4) are supported by proof. The legal standard is whether a reasonable person would provide a post-sale warning." Restatement (Third) Torts, Products Liability, § 10 at comment *a*. Although "the particular circumstances of a case may permit a trial court to

utilize the [Restatement's four] factors to determine as a matter of law no duty existed[, n]ormally . . . the jury determines whether a warning of a product danger should have been given" under the Restatement. <u>Lovick v. Wil-Rich</u>, 588 N.W.2d 688, 696 (Iowa 1999) (adopting Restatement (Third) Torts, Products Liability § 10 as the law in Iowa); <u>see also</u> <u>Robinson</u>, 500 F.3d at 697 (affirming summary judgment for defendants on § 10 failure to warn claim when there was no dispute that there was a post-sale warning campaign and that buyer received notice of the warning); <u>Liriano v. Hobart Corp.</u>, 700 N.E.2d 303, 309 (N.Y. 1998) (adopting § 10 and citing to it in stating that "[f]ailure-to-warn liability is intensely fact-specific").

Genuine disputes of material fact exist as to whether LVCI incurred a duty to warn under Restatement (Third) Torts, Products Liability § 10. The facts viewed most favorably to Kendall demonstrate that LVCI could identify the parties to warn and that Dr. Bormes and other ophthalmologists were unaware of the risk of harm. Further, facts support the conclusion that a warning could have been effectively communicated to and acted upon once received, because that is exactly what happened in this case. Additionally, there is a genuine dispute of fact as to whether LVCI knew or should have known of a "substantial risk of harm" from use of blades from lot #517984, and whether the "risk of harm [was] sufficiently great to justify the burden of providing a warning." Restatement (Third) Torts, Products Liability § 10(b)(1), (4). As the court finds that the four elements of § 10(b) are "supported by proof," it cannot conclude as

a matter of law that no duty exists in this case.  Accordingly, if this court were to apply the Restatement (Third) Torts, summary judgment for LVCI would still be denied.

### 2.  Immunity under SDCL 20-9-9

LVCI argues in the alternative that it is entitled to immunity under SDCL 20-9-9, which provides immunity for a distributor or retail seller unless it "in the exercise of ordinary care, should have known, of the defective condition of the final product."

The court has already determined that the facts, viewed in the light most favorable to Kendall, support the contention that LVCI is a seller or, alternatively, a commercial lessor.  There is, however, an important difference between a strict liability claim against the manufacturer of a defective product and a strict liability claim against a seller, distributor, or lessor.  SDCL 20-9-9 provides that a "dealer" is not liable under a strict liability theory unless the "dealer, wholesaler, [distributor], or retail seller knew, or, in the exercise of ordinary care, should have known of the defective condition of the final product." See also Restatement (Second) Torts § 402A, comment j (stating that a seller may be required to give a warning "if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge" of the danger).  The South Dakota Supreme Court in Peterson stated that this provision means that one can bring a strict liability claim against a distributor, "but as a matter of proof, knowledge of the defective condition will not be *imputed* to a

nonmanufacturing middleman as would otherwise be the case under strict liability." Peterson, 400 N.W.2d at 915 (finding a question of fact as to whether lessor knew or should have known of the defective condition). With SDCL 20-9-9, "[t]he South Dakota Legislature is said to have injected a negligence element into a § 402A strict liability claim brought against South Dakota manufacturing middlemen in order to make it more difficult for plaintiffs to recover in strict liability against such middlemen, and to 'encourage the injured party to seek recovery under strict tort and warranty against the remote manufacturer.' " Wynia v. Richard-Ewing Equip. Co., Inc., 17 F.3d 1084, 1088 (8th Cir. 1994) (citing Robert Dugan, *Reflections on South Dakota's Trifurcated Law of Products Liability*, 28 S.D. LAW. REV. 259, 272 (1983)). Whether the distributor knew or should have known of the product's defective condition is typically a question of fact for the jury. Peterson, 400 N.W.2d at 915.

The court finds that there is a genuine dispute of material fact as to whether or not a reasonable person in LVCI's position should have known of the defective condition of the product. In the three weeks leading up to Kendall's procedure, LVCI knew that there were DLK outbreaks at several facilities, and its employees were taking steps to identify the cause of such outbreaks. On December 4, 2004, Stacy Lerum told Denice Gerstenberger to examine the lot numbers of all disposable supplies used in the surgeries that had a high incidence of DLK, in order to possibly discover a common link between the DLK occurrences and the disposable supplies. It appears that Gerstenberger did not

do this. On December 10, 2004, after speaking with a B&L employee who pointed out the common element of blade lot #517984, Gerstenberger notified Lerum, who immediately issued a recall of that blade lot. A genuine dispute of material fact exists as to whether or not LVCI knew or should have known of the defective condition of blades from lot #517984; therefore, the court cannot conclude as a matter of law that the immunity under SDCL 20-9-9 applies to LVCI.

For all of these reasons, summary judgment on Kendall's strict liability claim is denied.

### B. Negligence

LVCI argues that summary judgment is required on Kendall's negligence claim because LVCI did not owe a legal duty to Kendall and because Kendall's injuries were not foreseeable to LVCI. Docket 204, pages 14-17. Finally, LVCI argues that Kendall cannot prove that LVCI's conduct in any way contributed to his injuries. Id. at 17.

While summary judgment is generally "not feasible" in negligence cases, "the determination of whether a duty exists is a question of law for the courts." Casillas v. Schubauer, 714 N.W.2d 84, 88 (S.D. 2006). The question of duty turns on whether "a relationship exists between the parties such that the law will impose upon the defendant a legal obligation of reasonable conduct for the benefit of the plaintiff." Id. (citation omitted). "Duty may be imposed by common law or by statute." Poelstra v. Basin Elec. Power Co-op, 545 N.W.2d 823, 826

(S.D. 1996).  "Whether a common-law duty exists depends on the foreseeability

of injury."  Peterson v. Spink Elec. Coop., 578 N.W.2d 589, 592 (S.D. 1998).  "No

one is required to guard against or take measures to avert that which a

reasonable person . . . would not anticipate as likely to happen."  Wildeboer v.

S.D. Junior Chamber of Commerce, Inc., 561 N.W.2d 666, 670 (S.D. 1997)

(citation omitted).  The law may impose a duty, however, when "[i]t was within

the range of defendant's apprehension that a risk of injury to plaintiff existed

and could have been avoided by the exercise of reasonable care."  Nicholas v. Tri-

State Fair & Sales Assoc., 148 N.W.2d 183, 186 (S.D. 1967).  The foreseeability of

injury must be determined based on the time "when the act or omission

occurred."  Id.

In South Dakota, a seller of a product owes a duty to one who may be

expected to be injured by that product.  Jahnig v. Coisman, 283 N.W.2d 557,

560 (S.D. 1979).  South Dakota courts have adopted the rule of Restatement

(Second) Torts § 388 in negligent failure to warn claims.  Burley v. Kytec

Innovative Sports Equip., Inc., 737 N.W.2d 397, 410 (S.D. 2007); Jahnig, 283

N.W.2d at 560.  That provision states:

> One who supplies directly or through a third person a chattel for
> another to use is subject to liability to those whom the supplier
> should expect to use the chattel with the consent of the other or to
> be endangered by its probable use, for physical harm caused by the
> use of the chattel in the manner for which and by a person for
> whose use it is supplied, if the supplier
>
> > (a)     knows or has reason to know that the chattel is or is
> > likely to be dangerous for the use for which it is
> > supplied, and

(b)    has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c)    fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

The court finds that LVCI owes a duty of ordinary care to Kendall. Even though LVCI argues vehemently that "Kendall's injuries were not foreseeable to LVCI," Docket 204, page 15, the facts in the light most favorable to Kendall demonstrate that LVCI was aware of recent outbreaks of DLK and was taking steps to identify potential causes. Six days before Kendall's surgery, Gerstenberger was told by Lerum to investigate the lot numbers of the disposable supplies provided to the clinics where DLK had occurred. Gerstenberger failed to investigate or identify common lot numbers, and it was only when B&L told LVCI that blade lot #517984 was the common element in the DLK outbreaks that LVCI took action to warn purchasers such as OA of a possible defect. LVCI knew of increased DLK occurrences among clinics with which it contracted, and facts support the allegation that LVCI reasonably could have discovered that surgeries which resulted in DLK all used blades from lot #517984. See DSUMF ¶ 37 (stating that LVCI checked its own records and "discovered that the one common element was that blades from Lot 517984 had been used"). The fact that Kendall's injuries were not *foreseen* does not mean that they were not *foreseeable*, and LVCI cannot hide behind its own failure to properly investigate potential causes of the DLK outbreaks by now arguing that it did not foresee

Kendall's potential injury. Because "[i]t was within the range of defendant's apprehension that a risk of injury to plaintiff existed and could have been avoided by the exercise of reasonable care," the court concludes that LVCI owed a duty to Kendall. See Nicholas, 148 N.W.2d at 186.

Additionally, Restatement (Second) Torts § 388 imposes a duty upon LVCI toward Kendall. LVCI is clearly a "supplier" within the ambit of § 388, and Kendall is one to whom LVCI may be liable under the terms of § 388. Comment c to § 388 states that the provision applies to "any person who for any purpose or in any manner gives possession of a chattel for another's use" and includes "sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person." Further, comment d to § 388 states that such a supplier is subject to liability under this rule not only to those to whom the chattel is directly supplied, "but also to third persons whom the supplier should be expected to be endangered by its use." As stated above, OA received from LVCI all AccuGlide blades it used in LASIK procedures performed at its facility. Further, there is no dispute that LVCI knew that blades it provided to OA would be used for LASIK procedures done on third persons such as Kendall. For these reasons, the court finds that LVCI owed a duty to Kendall under Restatement (Second) Torts § 388.

Next, LVCI briefly argues that summary judgment on Kendall's negligence claim is required because he "has provided no evidence that LVCI did anything to cause or contribute to Kendall's DLK." Docket 2-4-2, page 17. "Had there been

any reason to place blame upon LVCI, B&L would not have dismissed its cross-claim against LVCI." Id. Kendall does not address this argument directly in his response opposing LVCI's motion for summary judgment. Docket 225. Regardless, the court finds that there is a genuine dispute of material fact as to whether or not LVCI's failure to warn OA of the possibility of DLK occurrence in surgeries using blade lot #517984 was a proximate cause of Kendall's injuries. Because LVCI has failed to demonstrate that it is entitled to judgment as a matter of law based upon undisputed facts, the court denies summary judgment on this ground.

Finally, in its reply brief, LVCI argues that Kendall's lack of expert testimony to support its claims against LVCI requires summary judgment on its behalf. Docket 247, page 5 (citing Burley, 737 N.W.2d at 407-08). In its order denying in part B&L's motion for summary judgment, this court found that, while expert testimony may be required in products liability cases such as this one, it is unable at this time to determine the admissibility of Dr. Hardten's testimony or to draw any conclusions as to whether or not it would be proper expert testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). As consideration of this question of expert testimony has not been properly raised with regard to Kendall's claims against LVCI, the court declines to examine it at this time.

For all of these reasons, LVCI's motion for summary judgment on Kendall's negligence claim is denied.

22

## II.    Breach of Implied Warranty

LVCI states that it "joins B&L's argument and authorities with respect to
Kendall's breach of warranty claims."  Docket 204, pages 17-18.  Additionally,
LVCI argues that LVCI is not a "seller" or "merchant" of goods under SDCL
57A-2-314, and therefore cannot be liable for breach of an implied warranty.  Id.
at 18.

SDCL 57A-2-314 provides:

(1)    Unless excluded or modified . . . , a warranty that the goods
       shall be merchantable is implied in a contract for their sale if
       the seller is a merchant with respect to goods of that kind.

(2)    Goods to be merchantable must be at least such as

       (a)    Pass without objection in the trade under the contract
              description; and

       . . .
       (c)    Are fit for the ordinary purposes for which such goods
              are used; and
       . . .

       (e)    Are adequately contained, packaged, and labeled as the
              agreement may require[.]

Said another way, "[t]he warranty of merchantability generally promises that 'the
goods will conform to the ordinary standards and are of average grade, quality,
and value of like goods which are generally sold in the stream of commerce.' "
Rynders v. E.I. Du Pont, De Nemours & Co., 21 F.3d 835, 841 (8th Cir. 1994).  A
"merchant" is one "who deals in goods of the kind or otherwise by his occupation
holds himself out as having knowledge or skill peculiar to the practices or goods
involved in the transaction."  SDCL 57A-2-104.  While some provisions of the

UCC apply to "almost every person in business," other provisions such as the implied warranty of merchantability are limited in application to those who are "merchant[s] with respect to goods of that kind," restricting the implied warranty to a "much smaller group." Id. at cmt. 2. Whether or not a party is a merchant is a question of fact. Colton v. Decker, 540 N.W.2d 172, 179 (S.D. 1995). Finally, there is no privity requirement for recovery on implied warranties in South Dakota. Rynders, 21 F.3d at 839 (citing SDCL 57A-2-318).

Considering the facts in the light most favorable to Kendall, there is a genuine dispute of material fact as to whether or not LVCI held itself out to be one "who deals in goods of that kind" or "holds [itself] out as having knowledge or skill peculiar to the practices or goods involved in the transaction." SDCL 57A-2-314. Additionally, even if the jury were to find that LVCI is a merchant, there are further questions as to whether the goods were merchantable and whether LVCI breached the implied warranty of merchantability. These factual determinations are for the jury, and LVCI has failed to demonstrate that the jury should not hear them. Because LVCI cannot show the absence of a dispute of fact and has not demonstrated that it is entitled to judgment as a matter of law, the court denies its motion for summary judgment on Kendall's implied warranties claim.

**III.    Breach of Express Warranty**

LVCI also argues that it is not a "merchant" under SDCL 57A-2-104, and that it cannot be liable for breach of an express warranty. Docket 204, page 18. As stated above, the court cannot conclude that LVCI is not a merchant based

on the undisputed facts, and thus this becomes a question for the jury.

Additionally, LVCI argues that "there must be an affirmation of fact or a promise by the seller to the buyer which relates to the goods and becomes part of the bargain for the presence of an express warranty." Id. Without such an express warranty, claims LVCI, summary judgment on this claim should be granted.

SDCL 57A-2-313 describes the creation of express warranties as follows:

(a)     Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b)     Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c)     Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

This statute reflects "the common law principle that the seller who affirms any fact or makes any promise concerning the goods which he or she is selling makes an express warranty, if the buyer, relying on that affirmation or promise, is induced to buy the goods." James River Equip. Co. v. Beadle County Equip., Inc., 646 N.W.2d 265, 268 (S.D. 2002) (citing 2 Deborah L. Nelson & Jennifer L. Howicz, Williston on Sales § 15-6, at 377 (5th ed. 1995)).  Just as with implied warranties, a seller's warranty "extends to any person who may reasonably be expected to . . . be affected by the goods and who is injured by breach of the warranty."  SDCL 57A-2-318.

While Kendall in his complaint states that "Defendants expressly warranted that its surgical blades were safe," he fails to set forth facts in support of this allegation that LVCI made any representations to OA or to Kendall that the blades were safe. The only reference made to any express warranties is in Kendall's response to LVCI's statement of material facts, in which he contends that Article 7 of the contract "contains warranty language." Docket 227 ¶ 17. That part of the Refractive Laser Access Agreement discusses LVCI and OA's rights and responsibilities related to indemnification in the event of loss or damage arising from breach of warranty. Docket 226-2 page 9. It does not, however, contain any "affirmation of fact or promise . . . which relates to the goods" nor does it include a "description of the goods." See SDCL 57A-2-313. Therefore, the court concludes that the Refractive Laser Access Agreement does not contain any express warranties.

Express warranties require affirmative words or conduct that become "part of the basis of the bargain," and they involve the " 'dickered' aspects of the individual bargain." SDCL 57A-2-313, cmt. 1. Kendall's complaint and his Statement of Undisputed Material Facts do not contain any express warranties as to the AccuGlide blades, nor do any of the numerous exhibits submitted by Kendall. See Docket 228 (PSUMF). Additionally, Kendall alleges no facts that either he or OA relied on any affirmative promises from LVCI that the blades were safe or that DLK would not occur when these blades were used. Cf. James River Equip. Co., 646 N.W.2d at 271 (finding that seller's written representations

in an attachment to the purchase agreement were an express warranty on the goods sold). That such warranties become a basis of the bargain is an essential part of a claim of breach of express warranties. SDCL 57A-2-313.

Viewing the submitted facts in the light most favorable to Kendall, the court finds that Kendall has failed to present any facts that LVCI made any express warranties to OA or Kendall regarding the quality of the blades. For these reasons, LVCI's motion for summary judgment on Kendall's claim for breach of express warranties is granted.

## IV. Negligent Infliction of Emotional Distress

Finally, LVCI asserts that because Kendall cannot establish negligent conduct on the part of LVCI, summary judgment on its behalf is required. Docket 204, page 19. Because summary judgment is not warranted on Kendall's negligence claim, and because LVCI gives the court no additional reason to grant summary judgment on this claim of negligent infliction of emotional distress, summary judgment is denied.

## CONCLUSION

LVCI's motion for summary judgment is denied with regard to Kendall's claims of strict liability, negligence, breach of implied warranty, and negligent infliction of emotional distress. LVCI's motion for summary judgment is granted with regard to Kendall's breach of express warranty claim.

Accordingly, it is hereby

ORDERED that LVCI's motion for summary judgment (Docket 203) is

GRANTED IN PART and DENIED IN PART in accordance with this order.

Dated June 17, 2009.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE